156 F.3d 581
 77 Fair Empl.Prac.Cas. (BNA) 1699,
74 Empl. Prac. Dec. P 45,510
Julie DEFFENBAUGH-WILLIAMS, Plaintiff-Appellee/Cross-Appellant,
v.
WAL-MART STORES, INC., et al., Defendants,
Wal-Mart Stores, Inc., Defendant-Appellant/Cross-Appellee.
 No. 97-10685.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 24, 1998.
 
 Mark C. Brodeur, Dallas, TX, for Deffenbaugh-Williams.
 Jimmy Preston Wrotenbery, Kevin D. Jewell, Magenheim, Bateman, Robinson, Wrotenbery & Helfand, Houston, TX, for Wal-Mart Stores, Inc.
 Appeals from the United States District Court for the Northern District of Texas.
 Before JOLLY, SMITH and BARKSDALE, Circuit Judges.
 RHESA HAWKINS BARKSDALE, Circuit Judge:
 
 
 1
 For the numerous issues presented regarding the amended judgment, the principal matter at hand is the imposition of punitive damages against an employer, through vicarious liability, for a racially discriminatory termination, in the light of two very recent Supreme Court decisions regarding employer vicarious liability for sexual harassment. A jury having found Wal-Mart Stores, Inc., liable under Title VII, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981, for such termination of Julie Deffenbaugh-Williams (Deffenbaugh), and having awarded her compensatory and punitive damages, Wal-Mart raises liability and the failure to mitigate the compensatory damages; Deffenbaugh, the district court's setting aside, as a matter of law, the punitive damages. In the alternative, Wal-Mart asserts that the punitive damages are excessive. We AFFIRM as to liability and the amount of compensatory damages; as to the denial of punitive damages, we REVERSE, but order a remittitur of $25,000, resulting in those damages being reduced from $100,000 to $75,000, with Deffenbaugh having the option of a new trial on such damages.
 
 I.
 
 2
 Deffenbaugh began working for Wal-Mart in 1979 as the jewelry manager for its store in Bowie, Texas. She voluntarily quit in 1982. In 1989, she began working as a sales associate at the Wal-Mart Hypermart in Arlington, Texas. In 1990, Deffenbaugh was promoted to manager of the jewelry department.
 
 
 3
 In May 1992, Deffenbaugh, who is white, began dating Truce Williams (Williams), a black sales associate in the Arlington Hypermart men's wear department. They did not reveal the existence of their relationship to their co-workers.
 
 
 4
 Charlotte England served as Deffenbaugh's direct supervisor until May or June 1993, when Dale Gipson became District Manager of the shoe and jewelry departments of six Wal-Mart stores, including the Arlington Hypermart. As manager of the jewelry department employees at the Hypermart, Gipson had direct supervisory authority over Deffenbaugh. Around this same time, Pat Price became the manager of Deffenbaugh's store; but, he never directly supervised Deffenbaugh.
 
 
 5
 In May and August 1993, Price saw Deffenbaugh and Williams together at local restaurants; and, on one of these occasions, saw them kiss. In August 1993, shortly after the second occasion on which he saw Deffenbaugh and Williams together in public, Price asked Deffenbaugh to attend a lunch meeting at a local restaurant to discuss store inventory. Deffenbaugh testified that Price, England, and Gipson attended this meeting; and that, in the presence of Price and Gipson, England told Deffenbaugh that she "would never move up with the company being associated with a black man and that Wal-Mart frowned upon fraternization with[in] the company". Deffenbaugh responded that her personal business was not their concern, "because it did not affect [her] job performance". Price and Gipson did not respond to these comments.
 
 
 6
 In October 1993, Price advised Deffenbaugh about Wal-Mart's nonfraternization policy; and she signed a written acknowledgment of this policy. But, the policy did not prohibit employees from dating if they were not in a direct supervisory relationship.
 
 
 7
 Prior to December 1993, Deffenbaugh's performance evaluations were favorable and she earned high revenues for the store. Early that December, however, Gipson reprimanded Deffenbaugh for an incident that October, in which she set aside a bottle of perfume to purchase at the end of her shift. Gipson accused her of "shopping on the clock", i.e., shopping for store merchandise during working hours. (In late November, Gipson and Greg Shelton, the Wal-Mart Loss Prevention Manager, had initially accused Deffenbaugh of stealing the perfume.)
 
 
 8
 Deffenbaugh was suspended for one day and returned to work only after she had prepared and signed a "plan of action", outlining how she would improve her work performance. The plan included a statement that she would "never shop while on company time". Despite her compliance with these instructions, Deffenbaugh believed the reprimand was pretextual, noting that there was no written policy prohibiting "shopping on the clock".
 
 
 9
 Deffenbaugh testified that, after this reprimand, she contacted David Norman, the Wal-Mart regional manager, and told him that the Wal-Mart managers were "out to get [her] ... because of [her] dating [Williams]...." Norman replied that it was not a problem if she was dating a black man and assured her that he would "check into it".
 
 
 10
 On Friday, 14 January 1994, the day after Deffenbaugh married Williams, he told her that he wanted to purchase a VCR from the electronics department. Just before 4:00 p.m., Deffenbaugh, before clocking out, went to the men's wear department to give Williams cash from a paycheck she earlier had cashed for him. Williams asked Deffenbaugh for her Wal-Mart discount card. Deffenbaugh testified that she stopped near the electronics department cashier and handed Williams, not the cashier, the card. Williams used the card to purchase the VCR, while Deffenbaugh went to check on the jewelry department before walking to the front of the store to clock out.
 
 
 11
 The next morning, Williams' supervisor, Arthur Stanford, telephoned Williams and informed him and Deffenbaugh that "they" were going to "mess with" and "terminate" Deffenbaugh on the following Monday. On Wednesday, 19 January 1994, Gipson told Deffenbaugh that her employment was terminated because she had "shopp[ed] on the clock" again. Deffenbaugh countered that the VCR had been purchased by Williams, not her; and that Gipson could verify this by asking a fellow employee who had seen Williams make the purchase. Instead, Gipson relied on the cashier's handwritten report that Deffenbaugh had been present when Williams made the purchase, and that store records showed that the card was used before Deffenbaugh clocked out.
 
 
 12
 Deffenbaugh brought this action against Wal-Mart in March 1995, claiming, inter alia, that, in violation of Title VII and § 1981, she, a white female, was discharged because she was dating a black male. Prior to the trial in July 1996, the district court dismissed all claims except that of racial discrimination.
 
 
 13
 At the close of Deffenbaugh's case, and pursuant to FED.R.CIV.P. 50, Wal-Mart moved for judgment as a matter of law, asserting that Deffenbaugh failed to establish a prima facie case because she is not a member of a protected class; that there was no evidence of discriminatory animus; that Wal-Mart could not be liable for compensatory damages after December 1994, when Deffenbaugh voluntarily terminated her next employment; and that Deffenbaugh was not entitled to punitive damages. The court immediately denied the motion; and Wal-Mart announced that it rested, without presenting any evidence. At the charge conference, Wal-Mart renewed the same motion for judgment; it was, again, denied.
 
 
 14
 The jury found that race was a motivating factor in Wal-Mart's decision to discharge Deffenbaugh; specifically, that she was discharged because of her association with a black person. It awarded compensatory damages for lost-earnings of $19,000 and punitive damages of $100,000. Judgment was entered to that effect in September 1996.
 
 
 15
 Prior to entry of judgment, Wal-Mart renewed, and post-entry amended, its motion for judgment as a matter of law and moved for a new trial. A hearing was held in December 1996. As a result, for the punitive damages issue, the district court ordered supplemental briefing on the effect of Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927 (5th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997). Patterson, which our court decided approximately a week before the verdict for Deffenbaugh, is quite similar to the case at hand, in that it had Title VII and § 1981 claims for racial discrimination in employment, and involved, inter alia, issues concerning employer vicarious liability, mitigation of compensatory damages, and punitive damages, to include whether they were excessive. Unlike the case at hand, Patterson was a bench, not a jury, trial.
 
 
 16
 In May 1997, pursuant to a comprehensive opinion by the district court, and in the light of Patterson, judgment as a matter of law was granted for Wal-Mart as to punitive damages, the district court holding that Wal-Mart was not vicariously liable for such damages, even though its employee had terminated Deffenbaugh in violation of Title VII and § 1981. Therefore, the district court did not reach whether the punitive damages award was excessive. Otherwise, Wal-Mart's motions were denied. Both parties appeal the amended judgment.
 
 II.
 
 17
 Wal-Mart contends that it was entitled to judgment as a matter of law; alternatively, that the compensatory damages for lost-earnings must be reduced. Deffenbaugh cross-appeals the denial of punitive damages; in the alternative, Wal-Mart maintains such damages are excessive.
 
 A.
 
 18
 Liability is contested in two ways: (1) failure to establish a prima facie case; and (2) insufficient evidence of racial discrimination. Contrary to its claim that it is not vicariously liable for punitive damages, as discussed infra in part II.C.1., Wal-Mart does not make a similar claim concerning liability.
 
 1.
 
 19
 Concerning the prima facie case, Wal-Mart maintains that Deffenbaugh failed to show both that she is a member of a protected class and that she is qualified for the position. It appears this is based on the district court's denial of Wal-Mart's motion for judgment as a matter of law at the close of Deffenbaugh's case-in-chief. As discussed below, only the first point (not in protected class) was raised in that motion; the second (not qualified for position) was not raised until the post-verdict motion.
 
 
 20
 "Claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII." LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 448 n. 2 (5th Cir.1996). Therefore, "to succeed on a claim of intentional discrimination under Title VII ... or [§ ] 1981, a plaintiff must first prove a prima facie case of discrimination". Wallace v. Texas Tech Univ., 80 F.3d 1042, 1047 (5th Cir.1996).
 
 
 21
 Discrimination claims under Title VII and § 1981, based on circumstantial evidence, are subject to the well-established burden-shifting provided in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, Deffenbaugh was required to establish a prima facie case; to show, by a preponderance of the evidence, that she: (1) is a member of a protected class; (2) was qualified for the position; (3) was terminated; and (4) was replaced by someone outside the protected class. E.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); Ward v. Bechtel Corp., 102 F.3d 199, 202 (5th Cir.1997); Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 992 (5th Cir.1996) (en banc).
 
 
 22
 Under this procedure, if Deffenbaugh meets this burden, a presumption of discrimination arises, which Wal-Mart may overcome by proffering a legitimate, nondiscriminatory reason for the termination. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817; Rhodes, 75 F.3d at 992-93. If Wal-Mart meets this burden, the presumption disappears; but, Deffenbaugh has the opportunity to prove that Wal-Mart's articulated reason for termination was a pretext for discrimination. McDonnell Douglas, 411 U.S. at 804, 93 S.Ct. 1817; Rhodes, 75 F.3d at 993.
 
 
 23
 The shifting presumptions alter only the burden of production; "[t]he ultimate burden of persuading the [jury] that [Wal-Mart] intentionally discriminated against [Deffenbaugh] remains at all times with [Deffenbaugh]". Hicks, 509 U.S. at 507, 113 S.Ct. 2742 (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) (emphasis added); see also FED.R.EVID. 301. And, it is more than well-established that, "[a]fter a case has been fully tried on the merits, the McDonnell Douglas burden shifting analysis ceases to be of import to an appellate court". Patterson, 90 F.3d at 933; accord United States Postal Serv. Bd. v. Aikens, 460 U.S. 711, 714-16, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); Travis v. Board of Regents of the Univ. of Tex., 122 F.3d 259, 263 (5th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 1166, 140 L.Ed.2d 176 (1998); Harrington v. Harris, 118 F.3d 359, 367 (5th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 603, 139 L.Ed.2d 491 (1997); Molnar v. Ebasco Constructors, Inc., 986 F.2d 115, 118 (5th Cir.1993); Walther v. Lone Star Gas Co., 952 F.2d 119, 122-23 (5th Cir.1992). "Instead, our inquiry becomes whether the record contains sufficient evidence to support the conclusions reached by the [jury]." Patterson, 90 F.3d at 933; LaPierre, 86 F.3d at 448.
 
 
 24
 This notwithstanding, Wal-Mart appears to contend that, even when there has been a jury verdict, we nevertheless review proof vel non of the elements of a prima facie case in the context of the denial of judgment as a matter of law at the close of the plaintiff's case. We need not reach this question because, as noted, Wal-Mart did not present a case. Instead, it presented evidence only by cross-examination of the witnesses called for Deffenbaugh's case.
 
 
 25
 In any event, the elements of a prima facie case must, of course, be satisfied. E.g., Hicks, 509 U.S. at 509-10, 113 S.Ct. 2742. For our purposes, the issue is whether the case should have been submitted to the jury. We deal with that question infra, in reviewing the sufficiency of the evidence challenge; doing so, of course, only within the confines of the issues properly raised both in district court and here.
 
 2.
 
 26
 As for whether the evidence was sufficient for the jury to find Wal-Mart liable for racial discrimination under Title VII or § 1981, in reviewing the "denial of [a Rule 50 motion], the appellate court uses the same standard to review the verdict that the district court used in first passing on the motion". Hiltgen v. Sumrall, 47 F.3d 695, 699 (5th Cir.1995). Accordingly, we apply the well-known standard articulated in Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969) (en banc), overruled in part on other grounds by Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir.1997) (en banc):
 
 
 27
 [T]he Court should consider all of the evidence--not just that evidence which supports the non-mover's case--but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting [judgment as a matter of law] is proper.
 
 
 28
 In this regard, although "we might have reached a different conclusion if we had been the trier of fact, we are not free to reweigh the evidence or to re-evaluate credibility of witnesses". Hiltgen, 47 F.3d at 700 (quoting Rideau v. Parkem Indus. Serv., Inc., 917 F.2d 892, 897 (5th Cir.1990) (citation and quotation omitted)).
 
 
 29
 Again, after a case has been fully tried on the merits, we no longer focus on the McDonnell Douglas burden-shifting rubric; the inquiry becomes whether the record contains sufficient evidence to support the jury's ultimate finding of race discrimination. Nevertheless, as also discussed supra, in determining whether the evidence supports finding a Title VII or § 1981 violation, we may look to whether the plaintiff has produced evidence satisfying the prima facie elements under those statutes.
 
 Title VII provides:
 
 30
 It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....
 
 
 31
 42 U.S.C. § 2000e-2(a)(1). And, § 1981 provides:
 
 
 32
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....
 
 
 33
 a.
 
 
 34
 Wal-Mart contends that reasonable jurors could not find a Title VII violation, on the ground that Deffenbaugh failed to satisfy the membership-in-a-protected-class requirement. Specifically, it maintains that, for this case, the protected class is black persons, premised on its claim that it is Deffenbaugh's relationship with Williams, a black person, that is at issue; and that, because Deffenbaugh was replaced by a black employee, she has failed to demonstrate a prima facie case of Title VII discrimination.
 
 
 35
 In making this claim, Wal-Mart asserts, quite half-heartedly, that Title VII does not apply to employment discrimination premised on an interracial relationship. As Wal-Mart notes, this is an issue of first impression for our court. But, Wal-Mart fails to provide any sound reason why such discrimination is not covered by Title VII. It is true that, as Wal-Mart notes, Title VII's plain language does not address this precise point; but, read as a whole, it does. In essence, the claim, as made by Deffenbaugh, is that she was discriminated against, as proscribed by the following language from Title VII, "because of [her] race" (white), as a result of her relationship with a black person. In short, we agree with other courts that have concluded that Title VII does proscribe such discrimination. See Stacks v. Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316, 1327 n. 6 (8th Cir.1994); Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888, 891-92 (11th Cir.1986); see also Patrick v. Miller, 953 F.2d 1240, 1250 (10th Cir.1992); Sperling v. United States, 515 F.2d 465, 484 (3d Cir.1975), cert. denied, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976); Whitney v. Greater N.Y. Corp. of Seventh-Day Adventists, 401 F.Supp. 1363, 1366 (S.D.N.Y.1975); Reiter v. Center Consolidated Sch. Dist., 618 F.Supp. 1458, 1460 (D.Colo.1985); Gresham v. Waffle House, Inc., 586 F.Supp. 1442, 1445 (N.D.Ga.1984); cf. Oncale v. Sundowner Offshore Serv., Inc., --- U.S. ----, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) (holding that Title VII covers same-sex sexual harassment, even though not specifically enumerated in the language of the Act, because "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils").
 
 
 36
 In sum, Title VII prohibits discrimination in employment premised on an interracial relationship. This is consistent with our § 1981 precedent concerning employment discrimination because of interracial marriages (Deffenbaugh's marriage to Williams just before her discharge is not one of her asserted reasons for her discharge); " § 1981 provides a cause of action to a white spouse who alleges that he was discriminated against in employment because of his marriage to a nonwhite". Alizadeh v. Safeway Stores, Inc., 802 F.2d 111, 114 (5th Cir.1986).
 
 
 37
 Concomitantly, we disagree with Wal-Mart's quite strained assertion that the relevant protected class is blacks. Deffenbaugh, who is white, alleged that she was fired because she was engaged in an interracial relationship. See Parr, 791 F.2d at 891 (citing Whitney, 401 F.Supp. at 1366, and Reiter, 618 F.Supp. at 1460). She produced evidence to that effect, and it was not impermissible for the jury to find a violation under Title VII premised on discrimination based on that relationship. Restated, and assuming sufficient supporting evidence, a reasonable juror could find that Deffenbaugh was discriminated against because of her race (white), if that discrimination was premised on the fact that she, a white person, had a relationship with a black person.
 
 
 38
 b.
 
 
 39
 Wal-Mart maintains that Deffenbaugh produced insufficient evidence that its stated reason for discharging her was a pretext; it asserts that there is no evidence that her termination was because of her association with a black male. Deffenbaugh had the burden to prove that Wal-Mart's purported reason for her termination was a pretext for racial discrimination. E.g., Travis, 122 F.3d at 263. "[Deffenbaugh] may demonstrate pretext either by showing that a discriminatory motive more likely motivated [Wal-Mart], or that [Wal-Mart]'s explanation is unworthy of credence." Harrington, 118 F.3d at 367-68.
 
 
 40
 Wal-Mart's asserted reason for terminating Deffenbaugh was that she was "shopping on the clock". (This ties in with the claim that she failed to prove one of the prima facie elements for her claim: being qualified for her position. But, Wal-Mart failed to preserve that precise point; it did not raise it in its pre-verdict motion for judgment as a matter of law. In any event, that question is subsumed within the point now at issue: discriminatory discharge.)
 
 
 41
 Prior to December 1993, Deffenbaugh had received favorable performance reviews, promotions, and pay increases. In fact, Gipson, who terminated her, testified that he did not have problems with the way Deffenbaugh was running the jewelry department.
 
 
 42
 As discussed, Deffenbaugh testified that, on 14 January 1994, she gave Williams her discount card, because he wanted to purchase a VCR. While he made this purchase in the electronics department, Deffenbaugh returned to the jewelry department and then to the front of the store to clock out.
 
 
 43
 When Gipson told Deffenbaugh that she was terminated for "shopping on the clock", she explained that the VCR had been purchased by Williams, not her; and that Gipson could verify this by asking a fellow employee who had seen Williams make the purchase. Deffenbaugh testified that Gipson told her that his "mind [was] made up". He did not interview possible witnesses to the sale, even after Williams approached him and told him that he had made the purchase; did not interview the cashier; and did not check to see if there was a videotape of the incident. Instead, Gipson relied on the cashier's handwritten report that Deffenbaugh had been present when Williams made the purchase, and that store records reflected the card's being used three minutes before Deffenbaugh checked out. But, Gipson testified that handing a discount card to one's spouse before clocking out would not be a violation of Wal-Mart policy. And, Deffenbaugh testified that she did not deal with the cashier who conducted the VCR transaction.
 
 
 44
 Moreover, even if Deffenbaugh was technically "shopping on the clock", the evidence was sufficient for a reasonable jury to find that it was not the motivating reason for Wal-Mart firing her. For example, Deffenbaugh testified that she observed other employees buying items at the end of their shifts without being disciplined, and had never heard of anyone else being terminated from Wal-Mart for "shopping on the clock". Gipson failed to investigate, even when confronted by Williams' corroboration of Deffenbaugh's version of events. And, Deffenbaugh had positive performance evaluations prior to the time her supervisors, including Gipson, became aware of her interracial relationship.
 
 
 45
 Regarding its claim that there was no evidence of a discriminatory motive, Wal-Mart continuously states that it is "undisputed" that Gipson, the supervisor who solely made the decision to discharge Deffenbaugh, had no knowledge of her interracial relationship. This is simply not correct. As discussed supra, Deffenbaugh testified that, at the August meeting attended by Gipson, England told her, in Gipson's presence, that Deffenbaugh "would never move up with the company being associated with a black man". After Deffenbaugh responded that her personal business was not their concern, "because it did not affect [her] job performance", Gipson remained silent. That meeting occurred only around five months before Deffenbaugh's termination.
 
 
 46
 Wal-Mart asserts that England's statement was a "stray remark" that cannot enter into the equation. See Ray v. Tandem Computers, Inc., 63 F.3d 429, 434 (5th Cir.1995) ("[A] single comment, made several years prior to the challenged conduct, is a stray remark too remote in time to support an inference of ... discrimination in later employment actions."). Far from being a "stray remark", the comment, made only around five months before termination and directly bearing on the discriminatory issue presented, is of critical importance.
 
 
 47
 Gipson testified that he was not present at the August meeting and was not aware of Deffenbaugh's relationship with Williams. In short, the jury was presented with two differing accounts; exercising its function of determining facts and assessing credibility, it obviously found Deffenbaugh's, not Gipson's, credible.
 
 
 48
 In this regard, a reasonable jury could also infer from Gipson's silence that he agreed with England's remark. And, it could infer from that remark, as well as Gipson's association with fellow supervisors Price (who had seen Deffenbaugh and Williams together in a romantic context) and England, that Gipson was aware of this relationship.
 
 
 49
 Moreover, Deffenbaugh testified that the morning after January 14 (when Williams used Deffenbaugh's card to purchase the VCR), Williams was telephoned by his supervisor, Stanford, who informed Williams and Deffenbaugh that "they" were going to "mess with" and "terminate" Deffenbaugh on the following Monday.
 
 
 50
 The above evidence, viewed in the light and with all reasonable inferences most favorable to Deffenbaugh, was sufficient for reasonable jurors to find that Wal-Mart's decision to terminate her was because of her association with a black person; and that "shopping on the clock" was merely a pretext. Again, "we are not free to reweigh the evidence or to re-evaluate credibility of witnesses". Hiltgen, 47 F.3d at 700 (quoting Rideau, 917 F.2d at 897 (citation and quotation omitted)).
 
 B.
 
 51
 As covered by the district court's instructions and a detailed special interrogatory, the jury awarded Deffenbaugh $19,000 to compensate her for lost-earnings between her termination (January 1994) and the trial (July 1996). The instructions and interrogatory addressed Deffenbaugh's duty to mitigate those damages.
 
 
 52
 Wal-Mart contends that it is entitled to a remittitur, on the basis that the district court should not have permitted the jury to award such damages for the period after December 1994, when Deffenbaugh voluntarily quit subsequent employment. Wal-Mart raised this issue in its pre-verdict motions for judgment as a matter of law and, concomitantly, in its objections to the lost-earnings instructions and special interrogatory.
 
 
 53
 Wal-Mart had the burden at trial of proving Deffenbaugh's failure to mitigate damages. Sellers v. Delgado College, 902 F.2d 1189, 1193 (5th Cir.), cert. denied, 498 U.S. 987, 111 S.Ct. 525, 112 L.Ed.2d 536 (1990). Again, its evidence came in only through Deffenbaugh's case.
 
 
 54
 "Because an award of back pay is an equitable remedy designed to make the injured party whole, ... an injured party has a duty under both § 1981 and Title VII to use reasonable diligence to attain substantially similar employment and, thereby, mitigate damages." Patterson, 90 F.3d at 935; see also Sellers, 902 F.2d at 1193. And, "it necessarily follows that the claimant must also use reasonable diligence in maintaining that substantially similar employment". Patterson, 90 F.3d at 936. "The reasonableness of a Title VII claimant's diligence should be evaluated in light of the individual characteristics of the claimant and the job market." Sellers, 902 F.2d at 1193 (citation and internal quotation omitted).
 
 
 55
 Wal-Mart terminated Deffenbaugh in January 1994. She next worked at Venture stores from June 1994 until that December. She testified that she resigned following a sexual assault at her new residence with her in-laws; she had moved there (a lower-income residential area) because of her decreased earnings at her new job.
 
 
 56
 Deffenbaugh sought approximately $34,000 in lost-earnings. In conjunction with its claim that the jury should not have been allowed to consider lost-earnings after December 1994, Wal-Mart posits that, as so limited, the maximum the jury could have awarded Deffenbaugh was only approximately $10,000--the difference for the period January through December 1994 between what she would have earned at Wal-Mart (approximately $20,000) and what she did earn at Venture (approximately $9,400 for June-December 1994). It requests a remittitur to that amount.
 
 
 57
 Deffenbaugh presented proof of her lost-earnings, including why she left Venture, her attempts to obtain employment after she did so in December 1994, and her subsequent employment. The jury awarded $19,000, implicitly finding that Deffenbaugh made reasonable efforts to mitigate her damages.
 
 
 58
 But, again, Wal-Mart maintains that the jury should not have been allowed to consider the period after December 1994, when Deffenbaugh voluntarily quit her Venture employment. Consistent with the duty to mitigate, as outlined in Patterson, Wal-Mart's basis for its damages time bar, however, is only that "[v]oluntarily resigning from employment does not, and should not, constitute a reasonable good faith effort to maintain substantially equivalent employment".
 
 
 59
 As the mitigation tests, as well as Wal-Mart's assertion, reflect, the question is one of fact, see Patterson, 90 F.3d at 936; it keys on matters such as reasonableness, similarity, and diligence. On this record, a reasonable jury could find that Deffenbaugh satisfied her duty to mitigate damages. Therefore, the district court did not reversibly err in permitting the jury to consider awarding lost-earnings for the period after December 1994. For this issue, judgment as a matter of law was properly denied.C.
 
 
 60
 Deffenbaugh contests the district court's setting aside, pursuant to Patterson and as a matter of law, the jury's punitive damages award. "We review the district court's grant of a motion for judgment as a matter of law de novo." Hidden Oaks Ltd. v. City of Austin, 138 F.3d 1036, 1042 (5th Cir.1998) (citation omitted). But, again, "[t]o the extent that our review requires consideration of the evidence introduced by the parties, as opposed to pure questions of law, we apply the same standard as the district court, considering all evidence with all reasonable inferences in the light most favorable to the non-moving party". Id. (internal quotation and citation omitted).
 
 
 61
 Although punitive damages have long been available for § 1981 claims, see Jones v. Western Geophysical Co., 761 F.2d 1158, 1162 (5th Cir.1985), they were not available for Title VII claims until the 1991 amendments to the Civil Rights Act of 1964, 42 U.S.C. § 1981a. Those amendments served to unify the law for employment discrimination cases; accordingly, we apply the same criteria in considering the propriety of punitive damage awards under Title VII (§ 1981a) and § 1981. Patterson, 90 F.3d at 941-42. Under § 1981a(b)(1), punitive damages are to be awarded when the complaining party shows "that the respondent engaged in a discriminatory practice ... with malice or with reckless indifference to the federally protected rights of an aggrieved individual". (Emphasis added.)
 
 
 62
 Deffenbaugh contends (1) that Patterson, relied upon by the district court, does not preclude recovery of punitive damages, because Gipson's malice can be imputed to Wal-Mart; and (2) that in addition to Gipson, other employees acted with malice or were recklessly indifferent to her right to be free from racial discrimination. Wal-Mart disputes these contentions; alternatively, it maintains that the award was excessive.
 
 1.
 
 63
 For the bench trial in Patterson, our court held, 90 F.3d at 944, that it was an abuse of discretion to award punitive damages against an employer when "the record is completely void of evidence showing that [the employer] took part in any discriminatory conduct much less any 'malicious' or 'reckless' conduct". This conclusion was based on the discriminatory acts being committed solely by a "project manager" of one office; the employer provided a handbook establishing a nondiscrimination policy; testimony indicated that memoranda were distributed explaining complaint procedures; there was no evidence that plaintiffs followed any complaint procedures; and there was no evidence that the employer knew, or should have known, of the discriminatory acts of its project manager. Id. Our court concluded that the project manager's actions alone, without any showing that the employer "knew or should have known of [his] malicious or reckless conduct", did not support the imposition of punitive liability to the employer. Id. (emphasis added).
 
 
 64
 Patterson must be viewed in the light of two Supreme Court cases, decided shortly before oral argument in this case: Faragher v. City of Boca Raton, --- U.S. ----, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); and Burlington Indus., Inc. v. Ellerth, --- U.S. ----, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). (Post-argument, at our instruction, the parties filed supplemental briefs on the applicability of those cases.) There, the Court applied agency principles in determining whether an employer is vicariously liable for sexual harassment conducted by supervisory employees. In so doing, it noted that "there is nothing remarkable in the fact that claims against employers for discriminatory employment actions with tangible results, like hiring, firing, promotion, compensation, and work assignment, have resulted in employer liability once the discrimination was shown". Faragher, --- U.S. at ----, 118 S.Ct. at 2284 (emphasis added). These cases stated the rule as follows:
 
 
 65
 An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.... No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.
 
 
 66
 Faragher, --- U.S. at ---- - ----, 118 S.Ct. at 2292-93; Burlington, --- U.S. at ----, 118 S.Ct. at 2270 (emphasis added).
 
 
 67
 In adopting this standard, the Court's purpose apparently was not to state a standard solely for sexual harassment claims, but rather "to accommodate the agency principles of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees...." Burlington, --- U.S. at ----, 118 S.Ct. at 2270. Accordingly, it appears that the Court intended to apply these same agency principles to all vicarious liability inquiries under Title VII for acts by supervisors, including racial discrimination. See Faragher, --- U.S. at ---- n. 1, 118 S.Ct. at 2283 n. 1 ("Although racial and sexual harassment will often take different forms, and standards [may] not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment."); see also id. at ---- n. 3, 118 S.Ct. at 2290 n. 3 (stating that the Court's "obligation ... is to adapt agency concepts to the practical objectives of Title VII"). Therefore, even though the case at hand involves a racially-discriminatory-discharge claim, rather than one for sexual-harassment-hostile-work-environment, we find the standard enunciated in Faragher and Burlington controlling.
 
 
 68
 Viewed in the light of Faragher and Burlington, the ratio decidendi in Patterson falls short of the new standard. As stated, applying then-existing precedent, Patterson held that the supervising employee's actions alone, absent a showing that the employer "knew or should have known of [his] malicious or reckless conduct", do not support the imposition of punitive liability to the employer. 90 F.3d at 944 (emphasis added). But, as stated in Burlington, --- U.S. at ----, 118 S.Ct. at 2267,
 
 
 69
 although a supervisor's sexual harassment is outside the scope of employment because the conduct was for personal motives, an employer can be liable, nonetheless, where its own negligence is a cause of the harassment. An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it. Negligence sets a minimum standard for employer liability under Title VII; but Ellerth [the employee] seeks to invoke the more stringent standard of vicarious liability.
 
 
 70
 (Emphasis added.) The Court then fashioned the vicarious liability standard, quoted supra, based in part on THE RESTATEMENT (SECOND) OF AGENCY § 219(2)(d) (1957), which permits a master to be liable for the torts of his servant, committed outside the scope of employment, when the servant "was aided in accomplishing the tort by the existence of the agency relation". Id. at ---- - ----, ----, 118 S.Ct. at 2267-68, 2270. The court reasoned that a supervisor's tangible employment action, such as discharge, requires the aid of the agency relationship, i.e. official authority, to have effect. Id. at ---- - ----, 118 S.Ct. at 2268-69.
 
 
 71
 Moreover, Patterson refused, for purposes of punitive damages, to impute the supervisory employee's acts to the employer because the employee was only a "project manager", and not a "corporate officer". 90 F.3d at 944. But, as the Court's vicarious liability standard makes clear, all that is required is that the employee be "a supervisor with immediate (or successively higher) authority". Faragher, --- U.S. at ---- - ----, 118 S.Ct. at 2292-93; Burlington, --- U.S. at ----, 118 S.Ct. at 2270. Gipson was Deffenbaugh's direct supervisor; he was authorized to, and did, discharge her.
 
 
 72
 a.
 
 
 73
 Having concluded that Gipson's malicious or recklessly indifferent acts, if any, are imputed to Wal-Mart, we must determine whether there was sufficient evidence of such acts. Wal-Mart does not challenge the jury instructions regarding "malice" and "reckless indifference". The jury was instructed that it could award punitive damages only if the preponderance of the evidence showed that Wal-Mart discriminated against Deffenbaugh either:
 
 
 74
 (1) with malice, that is, out of ill will, spite or for the purpose of causing injury to [Deffenbaugh]; or
 
 
 75
 (2) with reckless indifference to [Deffenbaugh]'s right to be free from discrimination based on race.
 
 
 76
 As stated supra, reasonable jurors could believe Deffenbaugh's version of the events at the August 1993 meeting, during which England told her, in Gipson's presence, that Deffenbaugh "would never move up with the company being associated with a black man". As also stated above, Gipson's association with fellow supervisors (Price, who had seen Deffenbaugh and Williams together in a romantic context) and England, along with Gipson's silence in the face of this comment and Deffenbaugh's response, could be inferred to mean that he was aware of Deffenbaugh's interracial relationship and that he agreed with England's remark. Deffenbaugh also testified that she perceived tension between herself and these supervisors in the car ride back to work.
 
 
 77
 Deffenbaugh testified that, in December, Gipson reprimanded her for "shopping on the clock" in October; and that, even though this was the first time she had been so reprimanded, she was not given a verbal or written reprimand--instead, Gipson suspended her for one day. Deffenbaugh testified also that, shortly after this suspension, she was given a written reprimand for holding a Christmas party without contacting Gipson. Deffenbaugh testified that she left messages on Gipson's voice mail concerning the party; and that she had held this same party for four years. Deffenbaugh also testified that she observed other employees buying items at end of their shifts without being disciplined. A reasonable juror could draw the inference that, based on Deffenbaugh's positive evaluations prior to the August 1993 meeting, at which Gipson learned of Deffenbaugh's interracial relationship, these subsequent reprimands were motivated either by malice or with reckless indifference toward her right to engage in such a relationship.
 
 
 78
 And, as covered earlier, Deffenbaugh testified that, on the day she was terminated, after she explained that Williams purchased the VCR, Gipson told her that his "mind [was] made up". Gipson did not speak with any witnesses to the sale, even after Williams approached him and told him that he had made the purchase; did not interview the cashier; and did not check to see if there was any videotape of the incident. And, Gipson testified that handing a discount card to one's spouse before clocking out would not be a violation of Wal-Mart policy. A reasonable juror could draw the inference that Gipson refused to investigate, even when confronted by Williams' corroboration of Deffenbaugh's version of events, because he disapproved of her interracial relationship.
 
 
 79
 It goes without saying that the evidence of malice or reckless indifference is not overwhelming, but that is not the standard we apply. "[C]onsidering all evidence with all reasonable inferences in the light most favorable to the non-moving party", Hidden Oaks Ltd., 138 F.3d at 1042 (internal quotation and citation omitted), a reasonable juror could conclude that, based on the preponderance of the evidence, Gipson, and therefore, as discussed supra, Wal-Mart, discharged Deffenbaugh with malice or reckless indifference.
 
 
 80
 b.
 
 
 81
 Deffenbaugh contends also that employees other than Gipson, namely Price, England, Shelton, and Norman, were malicious or recklessly indifferent to her right to be free from racial discrimination. But, as stated supra, in the light of the recent Supreme Court cases, the evidence of malice or reckless indifference on the part of Gipson, the direct supervisor who discharged Deffenbaugh, was sufficient to permit punitive damages, as a matter of law, against Wal-Mart. Therefore, we need not reach this contention.
 
 2.
 
 82
 Because, as a matter of law, punitive damages were proper, we reach Wal-Mart's contention that the $100,000 award is excessive. In ruling on Wal-Mart's post-judgment motions, and because it held Wal-Mart was not liable for such damages, the district court did not reach the excessiveness issue.
 
 
 83
 Notwithstanding its brevity, Wal-Mart's excessiveness claim is quite vague. As discussed below, it does not claim that the award exceeds constitutional limits. In an extremely brief argument, it states that the "Supreme Court recently articulated three factors applicable to the reasonableness of a punitive damage award", citing BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); notes that "Patterson found BMW 's language instructive regarding the excessiveness of the punitive damages awarded in that case"; asserts, in one paragraph, that the award in this case "fails the BMW test", looking to each of the three factors; notes that, as discussed infra, Deffenbaugh relies on a pre-BMW case from another circuit, and does not even cite BMW; and closes by asserting that, if we allow punitive damages, we should either "remit the ... award ... or remand". (Emphasis added.)
 
 
 84
 Wal-Mart's only reference to constitutional limits is its claim that the "Supreme Court has recognized that an exemplary damage [award] of four times the amount of compensatory damages to be [sic] close to the constitutional limit", citing to BMW, 517 U.S. at 581, 116 S.Ct. 1589. But, as discussed infra, Wal-Mart attributes far too much certainty to the cited passage from BMW. In fact, in that passage, the Court was noting the different ratios of punitive to compensatory damages that it has found non-violative of constitutional limits, including a ratio far greater than the four-to-one noted by Wal-Mart. See id.
 
 
 85
 Likewise, Wal-Mart places far too much reliance on Patterson. The case at hand was tried to a jury; Patterson, to the district judge. Obviously, a challenge to damages awarded in a bench trial is not freighted with Seventh Amendment considerations. Hence, rather than ordering the plaintiff to make a remittitur, or, if the plaintiff declined, ordering a new trial on actual and punitive damages, as discussed infra, we instead remanded to the district court for it to reassess both types of damages. Here, the punitive ($100,000) to compensatory ($19,000) ratio is 5.26 to 1; in Patterson, because we ordered the actual damages award for plaintiff Brown reduced from approximately $63,000 to "substantially" below $23,000 (to be determined on remand), the ratio there of substantially less than $23,000 actual to $150,000 punitive would be much greater than that here. See Patterson, 90 F.3d at 943.
 
 
 86
 In sum, Wal-Mart falls far short of making a constitutional challenge to the size of the punitive damages award, if indeed that is the issue it was intending to present. Instead, its challenge, at best, is simply that the award is excessive. Therefore, on the one hand, BMW is "instructive", as we found it to be in Patterson; on the other hand, for this appeal, we will not develop in detail the three BMW-factors as will be necessary for a constitutional challenge. Such development awaits another day. Suffice it to say, each of the three factors involves numerous considerations. For example, the constitutional analysis will include the type injury inflicted, whether physical or economic; whose conduct is to be examined; and the geographic area within which comparable cases are to be found. See BMW, 517 U.S. at 575-78, 580-83, 116 S.Ct. 1589. Wal-Mart does not come close to presenting, much less developing, those considerations here.
 
 
 87
 The jury was instructed that, if it awarded punitive damages, then, for
 
 
 88
 fixing the amount, [it] should consider the following:
 
 
 89
 (1) How offensive was Wal-Mart's conduct?
 
 
 90
 (2) What amount is needed to prevent repetition of such conduct in light of Wal-Mart's financial condition?
 
 
 91
 (3) Does the amount bear a reasonable relationship to the actual damages awarded?
 
 
 92
 The factors to have been considered by the jury are, understandably, similar to the three factors designated in BMW, 517 U.S. at 559, 116 S.Ct. 1589, for determining the constitutional limits, under the Due Process Clause of the Fourteenth Amendment, for the amount of punitive damages awarded in a state court trial: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the award and penalties authorized or imposed in comparable cases.
 
 
 93
 We stated in Patterson that "we understand that BMW deals with constitutional limits on punitive damages, but we find it instructive ". 90 F.3d at 943 (emphasis added). And, like the case at hand, and unlike the situation in BMW, Patterson concerned federal, not state, law. Concerning the application of BMW to federal cases, see, e.g., Lee v. Edwards, 101 F.3d 805, 809 n. 2 (2d Cir.1996).
 
 
 94
 Again, Wal-Mart requests us to either "remit" the amount of punitive damages "or remand" this issue to the district court. See Patterson, 90 F.3d at 943 (in the light of the BMW-factors, remanding for reassessment of punitive damages amount awarded in bench trial against employee project manager); FDIC v. Hamilton, 122 F.3d 854, 862 (10th Cir.1997) (in the light of the BMW factors, ordering reduction of punitive damages awarded in bench trial on state law fraud claim); Mathie v. Fries, 121 F.3d 808, 817-18 (2d Cir.1997) (same for bench trial on § 1983 prisoner action); Lee, 101 F.3d at 809-13 (for § 1983 action against police officer for malicious prosecution and assault and battery, and rather than remand, court of appeals may determine amount of remittitur for jury's punitive damages award, pursuant to BMW factors; plaintiff has option of accepting the reduced amount or receiving new trial on issue of punitive damages); Continental Trend Resources, Inc. v. Oxy USA Inc., 101 F.3d 634, 642-43 (10th Cir.1996) (same for jury trial on state law fraud claim), cert. denied, --- U.S. ----, 117 S.Ct. 1846, 137 L.Ed.2d 1049 (1997). Deffenbaugh did not respond to Wal-Mart's "remit or remand" request.
 
 
 95
 In her affirmative cross-appeal brief on punitive damages, Deffenbaugh not only urges that they be reinstated, but also anticipates Wal-Mart's alternative excessiveness contention (as had been raised in district court). As to the amount, Deffenbaugh claims that the $100,000 is appropriate. But, as noted, Deffenbaugh did not respond through a reply brief to Wal-Mart's subsequent contentions that the award is excessive and that we should "remit or remand". Similar to Wal-Mart's brief, Deffenbaugh's briefing on this point is remarkable, both for what it does, and does not, say. As for the latter, it does not mention either Patterson or BMW; or whether the award can be reduced by us, or should first be considered by the district court; or whether, if there is a remittitur, Deffenbaugh should have the option of a new trial on that issue. (In not mentioning Patterson on this point, Deffenbaugh is at least being consistent. As noted by the district court in its post-judgment opinion addressing Wal-Mart's motion for judgment as a matter of law, Deffenbaugh was instructed post-judgment to discuss Patterson; in her response, she failed to do so.) And, as referenced supra, in urging that the 5.26 to 1 ratio of punitive to compensatory damages is proper, Deffenbaugh, unencumbered by any citation to BMW, which was decided approximately 20 months before she filed her cross-appeal brief here, notes that a ratio of almost 10 to 1 in an employment discrimination case was upheld by another circuit; sadly for our purposes, that decision was long before the BMW decision.
 
 
 96
 Wal-Mart's terse "remit or remand" request may be shorthand for the well-established rule that, if we order a remittitur, we must give Deffenbaugh the option of a new trial on that jury-determined issue. See, e.g., Hetzel v. Prince William County, --- U.S. ----, 118 S.Ct. 1210, 140 L.Ed.2d 336 (1998); Hansen v. Johns-Manville Prods. Corp., 734 F.2d 1036, 1046-48 (5th Cir.1984). Or, for the "remand" request, it could be suggesting either that the award was based on passion or bias, requiring a new trial on punitive damages, see Auster Oil & Gas, Inc. v. Stream, 835 F.2d 597, 603-04 (5th Cir.1988); or that the district court should rule on this issue before we do. Of this much we are certain: Wal-Mart does not claim bias or passion. But, again, other than that, the brevity of Wal-Mart's request prevents a positive answer to just what it is proposing.
 
 
 97
 In sum, the briefing on this point falls far short of that expected, required, and needed. This is especially harmful in the light of the newly evolving standards for this issue. For this and other obvious reasons, remand for the district court to rule first on excessiveness seems, at first blush, to be the proper course.
 
 
 98
 Instead, we have determined that we should address this issue now. We base this on two factors. First, we give special weight to Deffenbaugh's not responding to Wal-Mart's "remit or remand" request. Second, in any event, efficiency and economy for the parties and the courts dictate our ruling now. Again, although BMW concerns constitutional limits, it is instructive for reviewing other excessiveness claims for punitive damages. See, e.g., Mathie, 121 F.3d at 816-17. Pre-BMW, in deciding whether to implement the remittitur procedure for jury awards, our standard touched, of course, on considerations similar to the three BMW factors:
 
 
 99
 We do not reverse a jury verdict for excessiveness except on "the strongest of showings." The jury's award is not to be disturbed unless it is entirely disproportionate to the injury sustained. We have expressed the extent of distortion that warrants intervention by requiring such awards to be so large as to "shock the judicial conscience," "so gross or inordinately large as to be contrary to right reason," so exaggerated as to indicate "bias, passion, prejudice, corruption, or other improper motive," or as "clearly exceed[ing] that amount that any reasonable man could feel the claimant is entitled to." Nonetheless, when a jury's award exceeds the bounds of any reasonable recovery, we must suggest a remittitur ourselves or direct the district court to do so. Our power to grant a remittitur is the same as that of the district court. We determine the size of the remittitur in accordance with this circuit's "maximum recovery rule," which prescribes that the verdict must be reduced to the maximum amount the jury could properly have awarded.
 
 
 100
 Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 784 (5th Cir.1983) (footnotes omitted); see Hansen, 734 F.2d at 1046-48.
 
 
 101
 In deciding the excessiveness claim here, we have utilized the BMW-factors. But, again, we stress that future applications of these factors, especially for constitutional claims, may demand far more detailed consideration, with far more subissues. For this case, in the light of this jury award and the inadequate briefing by the parties, a fairly summary analysis will suffice.
 
 
 102
 a.
 
 
 103
 "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." BMW, 517 U.S. at 575, 116 S.Ct. 1589 (emphasis added). It goes without saying that any form of racial discrimination is "reprehensible". But, the evidence of "reprehensible" conduct (discrimination), even when viewed in the light most favorable to Deffenbaugh, is a close case, as was such evidence in Patterson, 90 F.3d at 943. The limited evidence of ill will, when viewed in the most favorable light to Deffenbaugh, was sufficient for the jury to infer malice; but, as the discussion concerning malice demonstrates, that evidence does not reveal a high degree of reprehensibility. For example, there was no verbal or physical abuse. See Patterson, 90 F.3d at 943; Lee, 101 F.3d at 809-10.
 
 
 104
 b.
 
 
 105
 As noted, the jury's $100,000 award for punitive damages is 5.26 times the $19,000 for compensatory damages. "The principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages has a long pedigree." BMW, 517 U.S. at 580, 116 S.Ct. 1589 (citations omitted). But, the Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula". Id. at 582, 116 S.Ct. 1589. "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). "We can say, however, that general concerns of reasonableness ... properly enter into the constitutional calculus." Id. As noted, the type harm inflicted or caused is a primary consideration in determining whether the ratio is acceptable. BMW, 517 U.S. at 580-83, 116 S.Ct. 1589; Lee, 101 F.3d at 810-11.
 
 
 106
 To some, on the facts in this case, a punitive damages award that is, as here, 5.26 times the compensatory amount may not be so disproportionate as to "raise a suspicious judicial eyebrow". TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 481, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (O'Connor, J., dissenting). Compare Haslip, 499 U.S. at 23-24, 111 S.Ct. 1032 (holding that punitive damages award of "more than 4 times the amount of compensatory damages" might be "close to the line" but does not "cross the line into the area of constitutional impropriety"), with TXO, 509 U.S. at 462, 113 S.Ct. 2711 (indicating that a ratio between the punitive award and the potential harm of ten to one does not "jar one's constitutional sensibilities") (citation omitted).
 
 
 107
 Unlike the situation in BMW, the injury here was not simply economic. Deffenbaugh's termination had wide-ranging adverse personal impact and consequences. And, again, we are not examining a constitutional challenge. In short, the ratio, standing alone, would not compel a remittitur.
 
 
 108
 c.
 
 
 109
 Finally, in comparing the award in this case to comparable cases (again, damages were based on Title VII and § 1981), we note that, for Title VII claims against an entity of Wal-Mart's size, § 1981a(b)(3) imposes a maximum combined punitive and compensatory limit of $300,000. Obviously, the total $119,000 awarded is well below this maximum. With respect to § 1981 claims, $100,000 is on the high-end for cases of this type in our circuit. See Patterson, 90 F.3d at 943 (citing Jett v. Dallas Indep. Sch. Dist., 798 F.2d 748 (5th Cir.1986)). For the geographic area to look to for comparable cases, see, e.g., Mathie, 121 F.3d at 816-17; Lee, 101 F.3d at 812-13.
 
 
 110
 In the light of the above discussion of the three BMW-factors, we conclude that the jury-awarded punitive damages of $100,000 are excessive. Wal-Mart's maliciousness or reckless indifference is a close call; the degree of reprehensibility is not great enough alone to support the amount of punitive damages awarded by the jury; and, compared to comparable cases, the award is high. Considering all these factors, a remittitur to $75,000 is required.
 
 III.
 
 111
 For the foregoing reasons, and regarding the amended judgment, we AFFIRM as to liability and the amount of compensatory damages; we REVERSE the denial of punitive damages, reduce the amount to $75,000, and REMAND. On remand, if Deffenbaugh accepts the remittitur, the district court shall grant it and enter judgment accordingly. If Deffenbaugh refuses the remittitur, the district court shall grant a new trial solely on the issue of punitive damages.
 
 
 112
 AFFIRMED in PART; REVERSED in PART; REMITTITUR of PUNITIVE DAMAGES; REMANDED.