# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 27, 2009

Charles R. Fulbruge III
Clerk

No. 08-60799

CHARLIE FLOYD

Plaintiff-Appellant

v.

AMITE COUNTY SCHOOL DISTRICT; AMITE COUNTY BOARD OF
EDUCATION; JOHN DAVIS, in his official and individual capacity;
BEACHUM WILLIAMS, in his official and individual capacity; MARY RUSS,
in her official and individual capacity

Defendants-Appellees

Appeal from the United States District Court for the Southern District of
Mississippi, Jackson Division

Before KING, GARWOOD and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Plaintiff Charles Floyd appeals the dismissal of his claims on summary
judgment against the Amite County School District, the School Board and
various school board members and employees following his termination as
principal of Amite County High School.  With respect to Floyd's federal race
discrimination claims, we agree with district court that Floyd failed to raise a
genuine issue of fact that he was discriminated against on the basis of his race.

We also find no error in the district court's dismissal of Floyd's state law claims. Accordingly, we affirm.

I.

From 2000 until the summer of 2002, Charles Floyd served as both track coach and principal at Amite County High School (ACHS) in Amite County, Mississippi. He had a long history as a track coach at the high school prior to that time. ACHS is a predominantly African-American high school and all of the significant actors in this case, including Floyd and the individual defendants, are African-American. On May 9, 2002, the School Board of the Amite County School District granted Floyd permission to operate a private track training program at the ACHS facilities during that summer. Floyd did not inform the School Board that, in addition to ACHS students and in contrast to his practice in previous years of the program, white students from private schools in the community would also be participating in the program. Floyd presented evidence demonstrating that John Davis, President of the School Board, was biased against him for allowing white private school students to participate in the summer track program at ACHS.

At the regular meeting held following completion of the track program on June 13, 2002, the School Board adopted a "dual position policy." which restricted "administrators from holding more than one position in [the] district, such as coaching and administration." As a result, Floyd elected to resign as track coach in order to keep his position as principal. Although there is some question as to the origin of the motion to adopt the dual position policy, the defendants claim and the district court found that the policy was consistent with instructions given to all School Board members by the State of Mississippi at a statewide conference of the Mississippi School Boards Association held in February 2002.

In the fall of 2002, Superintendent Mary Russ initiated an investigation into alleged irregularities in the manner in which Floyd was performing his duties as principal at ACHS. On October 10, 2002, Floyd was suspended from his position as principal pending Russ's investigation, and on November 15, 2002, Russ notified Floyd by letter that he was being terminated for the following reasons:

1. Improperly charging students a $75.00 fee for alleged tobacco violations. Further, in addition to the imposition of this $75.00 punitive fee, the alleged violators have been improperly suspended from school until the fee was paid. Additionally, none of the $75.00 fees have been accounted for to this date to this office after repeated requests.
2. Numerous inaccuracies, white-outs, additions, etc. in the cumulative records of Amite County students which you signed.
3. Removing the Physical Science course from the curriculum without authorization.
4. Holding track and field events on public school property for private groups without fully explaining to the board the details of these activities.
5. Failure to fulfill your duties as a full time principal by spending an inordinate amount of time on activities unrelated to your contractual responsibilities.
6. Failure to timely complete student schedules for the 2002-2003 school year.

Pursuant to Mississippi Code Annotated § 37-9-59, Floyd sought a due process hearing before the School Board, which was conducted over the course of several days by an independent hearing officer in March and April of 2003. On July 11, 2003, the School Board, after reviewing the hearing transcripts and the hearing officer's report, issued a unanimous opinion that Floyd's dismissal was a proper employment decision and not contrary to law. Pursuant to Mississippi Code Annotated § 37-9-113, Floyd appealed to the Amite County Chancery Court, which ruled on October 21, 2003, that the School Board's

decision was not supported by substantial evidence and therefore reinstated Floyd. The School District and the School Board appealed to the Mississippi Court of Appeals, which, in an *en banc* opinion issued on November 3, 2004, reversed the chancery court , finding that there was sufficient evidence to support Floyd's termination on grounds one (tobacco policy), two (inaccurate records), and six (school scheduling) listed in Russ's letter. Floyd filed a petition for writ of certiorari to the Mississippi Supreme Court, which was eventually denied on August 3, 2006.

Meanwhile, Floyd was also pursuing relief in federal court. On October 9, 2003, while his appeal was pending before the Mississippi chancery court, Floyd filed a charge of discrimination with the EEOC. On November 13, 2003, Floyd received a right to sue letter. On February 6, 2004, while his petition for writ of certiorari was pending before the Mississippi Supreme Court, Floyd filed the action underlying this appeal in the district court. In his complaint, Floyd alleged that his termination was "the product of racial animus toward Coach Floyd resulting from assisting the Caucasian student-athletes" in violation of Title VII. Floyd also asserted the following state law claims: breach of contract; negligent and/or intentional infliction of emotional and mental distress; civil conspiracy; defamation; tortious interference with contract; and trespass to chattels. Finally, in his prayer for relief, Floyd mentioned 42 U.S.C. § 1981, demanding a judgment "[d]eclaring that Defendants violation his rights to nondiscriminatory treatment under the Fourteenth Amendment and 42 U.S.C. § 1981, 2000, et seq."

The defendants filed a motion to dismiss, arguing that Floyd's claims were precluded under the doctrine of res judicata. The district court denied the motion, finding that Floyd did not have sufficient opportunity to raise his discrimination claims in the state proceedings. Later, the district court granted

defendant's subsequent motion for summary judgment on the merits. Floyd appeals.

## II.

The district court decided all issues in this case on the defendants' motion for summary judgment.[1] We review a grant of summary judgment *de novo* under the same standard applied by the district court. *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 725 (5th Cir. 1995). Summary judgment is appropriate when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Id.* Fact questions are viewed in the light most favorable to the nonmoving party and questions of law are reviewed *de novo*. *Id.*

## III.

Floyd first challenges the district court's dismissal of his Title VII claim on the basis that it was not filed timely. In order to file suit under Title VII, 42 U.S.C. § 2000e-5 requires that a plaintiff file a charge of discrimination with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." Russ suspended Floyd on October 10, 2002 and sent him the termination letter on November 15, 2002. However, the School Board did not affirm that decision until July 11, 2003. Floyd filed the charge with the EEOC on October 9, 2003. Therefore, Floyd's charge was timely only if we conclude that the School Board's decision was the relevant "alleged unlawful employment practice" for purposes of commencing the limitations period.

The district court concluded that the relevant employment decision was Floyd's termination by Russ on November 15, 2002. Because over one hundred

---

[1] Before addressing the merits of Floyd's various claims the district court concluded that Floyd failed to adequately plead a claim under § 1981. We need not address Floyd's appeal of that procedural ruling because we affirm the district court's dismissal of that claim on the merits.

and eighty days passed between that date and the date Floyd filed the charge with the EEOC, the district court concluded that Floyd's claim was time-barred. The district court relied on *Delaware State College v. Ricks*, in which the Supreme Court held that "the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods." 101 S.Ct 498, 506 (1980). Under this approach, Russ's termination of Floyd, not the School Board's decision on appeal, commenced the limitations period.

However, two key factors distinguish this case from *Ricks*. First, the Supreme Court in *Ricks* carefully examined the plaintiff's complaint to specifically identify the unlawful employment practice being alleged. *Id*. at 503-04. Further, the Supreme Court acknowledged the possibility that a "continuing violation" of Title VII might delay the running of the limitations period. *Id*. at 504. In *Ricks*, the plaintiff was denied tenure and terminated as a matter of course over a year later, but he only alleged discrimination in relation to the tenure decision. *Id*. at 501-02. The Court noted:

> If Ricks intended to complain of a discriminatory discharge, he should have identified the alleged discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment. But the complaint alleges no such facts. . . . In sum, the only alleged discrimination occurred -- and the filing limitations periods therefore commenced -- at the time the tenure decision was made and communicated to Ricks.

*Id*. at 504. In contrast, Floyd specifically alleged that Russ, Davis and others colluded to oust him as coach and principal based on his association with white students. This alleged concerted campaign began with the implementation of the dual position policy and culminated in the School Board's decision to terminate him. Therefore, unlike the plaintiff in *Ricks*, Floyd does specifically

allege that his termination by the School Board was the final act in a continuing violation of his rights.[2]

*Ricks* is further distinguishable in another key aspect. In *Ricks*, the Board of Trustees, which was vested with the ultimate authority over tenure decisions, chose to deny the plaintiff tenure. *Id.* at 501. Thus, even though a grievance process was available to the plaintiff that offered the possibility of relief, the Board of Trustee's decision represented the school's "official position." *Id.* at 505. In contrast, the Mississippi Supreme Court has clearly stated that in Mississippi the ultimate authority to terminate a school district employee resides with the school board, *not* the superintendent:

> If anything is clear, it is that the power . . .[to] remove district school employees for misconduct and to conduct hearings for that purpose has been completely withdrawn from that official [county superintendent] by the amended statute . . . It is equally clear that the removal hearing is to be before the board of trustees, and the actual power to remove or not to remove rests with [the School Board].

*Yarbrough v. Camphor*, 645 So. 2d 867, 870 (Miss. 1994)(quoting *Tutwiler v. Jones*, 394 So. 2d 1346 (Miss. 1981)). While a termination of an employee becomes final if it is not appealed, the decision is only preliminary if the employee requests a hearing before the school board. *Spradlin v. Bd. of Trustees of Pascagoula Mun. Sch. Dist.*, 515 So.2d 893, 897 (Miss. 1987). Thus, although Floyd was forced to cease working without pay upon receiving Russ's letter of termination on November 15, 2002, that decision did not represent the "official

---

[2] In a footnote, the *Ricks* court limited its holding to the facts before it and cautioned future courts to carefully consider the facts of each case: "Complaints that employment termination resulted from discrimination can present widely varying circumstances. In this case, the only alleged discriminatory act is the denial of tenure sought by a college professor, with the termination of employment not occurring until a later date. The application of the general principles discussed herein necessarily must be made on a case-by-case basis." 101 S.Ct. At 504 n.9.

position" of the School District until it was approved by the School Board on July 11, 2003.

Accordingly, Floyd's charge filed with EEOC on October 9, 2003 was timely and the district court erred in dismissing his Title VII claim on that basis.

IV.

Despite ruling that Floyd's Title VII and § 1981 claims should be dismissed, the district court addressed the merits of those claims. The district court concluded that those claims failed for two reasons. First, the district court found that under an associational discrimination analysis, Floyd had no personal relationship, intimate or otherwise, with the white students in the track program. Second, the district court recognized that Floyd did not actually allege that he was fired because he "associated with" the white students. We need not consider the argument that Floyd's association with the white students was not sufficiently close to assert an "association" claim, because we agree with the district court that Floyd has not established that he was discriminated against on the basis of his race. [3]

Title VII provides that it is an "unlawful employment practice for an employer to discharge an individual . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). This court has recognized that § 1981 and Title VII prohibit discrimination against an employee on the basis of a personal relationship between the employee and a person of a different race. *See Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975)(section 1981); *Deffenbaugh-Williams v. Wal-Mart Stores,* 156 F.3d 581, 589 (5th Cir. 1998)(Title VII), *vacated in part on other grounds in Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 182 F.3d 333 (5th Cir. 1999)(*en banc*).

---

[3] Floyd argues only that he was discriminated against because of his association with the white athletes in the track program. He raises no claim of retaliation in this appeal.

In *Deffenbaugh-Williams v. Wal-Mart*, the plaintiff, a white female, sued her employer-department store for race discrimination under Title VII, alleging that she was terminated because she was dating a black male. 156 F. 3d at 583. After a jury verdict in favor of the plaintiff, the employer appealed, asserting that Title VII did not apply to employment discrimination premised on an interracial relationship. *Id.* at 588. This court held that "a reasonable juror could find that [the plaintiff] was discriminated against because of her race (white), if that discrimination was premised on the fact that she, a white person, had a relationship with a black person." *Id.* This analysis was clearly framed in a manner consistent with the language of Title VII, which bars discrimination on the basis of the employee's race.

The Sixth Circuit explained why an associational discrimination claim is based on the plaintiff's race in *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988 (6th Cir. 1999). In *Tetro*, a white former employee brought a Title VII action alleging that his former employer discriminated against him because he had a bi-racial child. The circuit court explained:

> If he had been African-American, presumably the dealership would not have discriminated because his daughter would also have been African-American. Or, if his daughter had been Caucasian, the dealership would not have discriminated because Tetro himself is Caucasian. So the essence of the alleged discrimination in the present case is the contrast in races between Tetro and his daughter. This means that the dealership has been charged with reacting adversely to Tetro because of Tetro's race in relation to the race of his daughter. The net effect is that the dealership has allegedly discriminated against Tetro because of his race.

*Id*. at 994-995. *Tetro* accordingly held that the discharge of the plaintiff-employee violated Title VII. [4]

The association cases are predicated on animus against the employee because of his association with persons of another race. Although Coach Floyd alleged that he was terminated because of a relationship with persons of another race, the white track athletes, the evidence Floyd submitted does not indicate that any animus by his employer was directed at him because of his relationship with these athletes. Rather, the evidence reflects that the racial animus was directed solely towards the white students. Floyd's evidence of racial animus is based primarily on alleged statements by School Board President Davis. Floyd claimed in a deposition that Davis told him that "he did not - that they did not want them white kids over there at [ACHS]. Coach, you know better." Similarly, community members Hirschel and Celia Pearson testified by affidavit that, on or about March 30, 2003, Davis made statements to them to the effect that "Caucasian students had no business using [ACHS's] track facilities" and that "Floyd had no business trying to bring the African American and Caucasian students together with the summer track program." School Board President Davis' alleged statements indicate that he was angry with Floyd for allowing white students to intermingle with the black students at ACHS and/or use ACHS facilities, not because Floyd, a black coach, interacted with the white students. Floyd's attorney at oral argument confirmed that Floyd's mistake was allowing white and black students "to drink from the same water fountain," and stated that "regardless of whether he was white or black, that the racial animus

---

[4] *See also Holcomb v. Iona College*, 521 F.3d 130,139 (2d Cir. 2008)("[W]here an employee is subjected to adverse action because an employer disapproves of interracial association, the employee suffers discrimination because of the employee's *own* race."); *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986)("Where a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race.").

about mixing races would have cost Coach Floyd his job." Although Davis' statements reflect clear racial animus, nothing in these statements supports a conclusion that the animus was directed at Floyd on the basis of *his* race.

Since Floyd's proof fails to raise a genuine issue of fact that he was terminated on the basis of his race, the district court did not err in dismissing his claims under Title VII and § 1981.

## VI.

Finally, Floyd challenges the dismissal of his state law claims. The district court did not err in dismissing these claims. The district court correctly concluded that his breach of contract claim failed because "good cause" existed for Floyd's termination under Miss. Code Ann. § 37-9-59. The School Board was justified in firing Floyd for "incompetence" and "neglect of duty" in his handling of the school's records and scheduling. Miss. Code Ann. § 37-9-59. The district court did not err in dismissing Floyd's claim of intentional infliction of emotional distress because the defendants' alleged conduct does not rise to the level of outrageousness required to support such a claim. *Peoples Bank & Trust Co. v. Cermack*, 658 So.2d 1352, 1365 (Miss. 1995). Floyd's claim of civil conspiracy fails because the defendants are part of one large corporate entity, and a claim of conspiracy cannot be based on alleged interference with a contract between Floyd and themselves. *Hilliard v. Ferguson*, 30 F.3d 649, 652-53 (5th Cir. 1994); *Frye v. Am. Gen. Fin., Inc.*, 307 F.Supp. 2d 836, 843-44 (S.D. Miss. 2004); *Cenac v. Murray*, 609 So.2d 1257, 1269 (Miss. 1992). Floyd's claim of trespass to chattels based on the allegation that his replacement threw away items he left in his office upon being suspended is frivolous. The defendants had no obligation to care for the items Floyd left behind.

## VII.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

11