# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 14, 2011

No. 10-20540
Summary Calendar

Lyle W. Cayce
Clerk

ALFRED R. TORONKA,

Plaintiff-Appellant,

versus

CONTINENTAL AIRLINES, INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:08-CV-2582

Before DAVIS, SMITH, and SOUTHWICK, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Alfred Toronka appeals a summary judgment in favor of Continental Air-

lines ("Continental") on charges of employment discrimination based on race, col-

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 10-20540

or, national origin, and religion, and on failure reasonably to accommodate his disability. Because there were no similarly situated employees of a different race, color, national origin, or religion from Toronka's who were treated better than he was, and because Continental could not reasonably accommodate Toronka's disability, we affirm.

I.

The district court issued thorough factual findings, which we only summarize. Toronka is black, sixty-three years old, and originally from Sierra Leone. He identifies as a Seventh Day Adventist but also expresses a belief in voodoo, though he does not practice it. In 1997, Continental hired him as a material specialist in the Stores department, part of Continental's Technical Operations division. The Stores department orders, ships, receives, warehouses, and delivers aircraft parts to locations around George Bush Intercontinental Airport ("IAH"). Toronka worked in the technical operations warehouse at IAH. As of November 2009, the Stores department employed 112 people: 40 blacks, 41 whites, and 31 employees that were either hispanic or Asian-American. Of the 112 employees, 86 were material specialists like Toronka, and 74 had greater seniority than he did.

A material specialist is expected to work forty hours during one of three shifts, with two days off, each week. Every material specialist is expected to drive, operate a forklift and other machinery, and handle hazardous materials. There are two material specialist tasks that are not safety-sensitive—inventory and logbook.[1] Inventory is performed only on the first shift. Job openings, shifts, and days off are awarded by seniority according to the Stores Employment Policy. Because of his level of seniority, Toronka could not bid on the first

---

[1] Inventory may require operating an order picker.

No. 10-20540

shift and therefore could not do inventory.

Continental's employment manual contains disciplinary procedures for resolving performance problems and recommends termination of employees who are involved in severe performance incidents. In the alternative, the manual suggests the lesser sanction of suspension without pay. The manual also provides an Employee Assistance Program ("EAP") for mental health assessment, referral, follow-up, and monitoring of employees who experience personal or mental health problems. Continental can issue a mandatory EAP referral based on unsatisfactory job performance or behavior.

If Continental requires an employee to participate in the EAP, he must comply with all required referrals for diagnosis, treatment, and monitoring to manage or resolve the mental health issue. As required by law, EAP evaluations are independent and confidential; Continental has no input regarding treatment. The only facts not kept confidential from Continental are (1) whether the employee has kept the appointment and complied with the EAP referral and evaluation and (2) the final assessment of the employee's fitness to work. Between 2002 and 2007, twenty-nine people in Technical Operations were issued mandatory EAP referrals, including whites, Hispanics, and blacks.

In February 2003, Toronka was given a written warning following a serious safety violation for mishandling hazardous materials, resulting in mandatory participation in a four-day training program and a warning that a "[f]uture violation will result in an increase[d] degree of disciplinary action, up to and including termination." In October 2007, Toronka crashed a Continental van into the avionics department at IAH. Eyewitnesses testified that, while delivering a part from the warehouse to the avionics department, Toronka rounded the corner by Gate 45 at high speed, grazed an aircraft tug, and crashed through the front wall of the avionics department. Five employees were injured, and three, including Toronka, were taken to the hospital by ambulance. Toronka was is-

sued a speeding ticket by city police. An inspection of the van indicated that it did not experience mechanical failure, contrary to Toronka's assertion that the gas pedal got stuck.

At a meeting with Continental officials, Toronka offered no explanation other than the faulty gas pedal and that the accident was inevitable because of a dream his wife had. Continental concluded Toronka was at fault and that the accident was serious enough to result in termination, but it gave him an opportunity to keep his job after a two-week suspension and a mandatory EAP referral. Continental told Toronka that if he did not accept those terms, he would be terminated.

As part of the EAP process, Toronka was evaluated by a psychiatrist, a psychologist, and a neurologist. George Glass, a psychiatrist, recommended that Toronka undergo a thorough psychological evaluation to determine whether he was competent to return to work. That evaluation was performed by Arthur Tarbox, a clinical psychologist, who reported that Toronka suffered severely impaired cognitive functioning, moderately impaired verbal logic and abstract reasoning, severely impaired ability to attend to visual stimuli, a below-average ability to attend to complex verbal stimuli, severely impaired rote memorization ability, and severely impaired judgment and reasoning on demanding tasks. Tarbox was unable to rule out dementia and suggested that Toronka consult a neurologist.

Toronka then saw Randolph Evans, a neurologist, who recommended that he not drive and referred him to Glass to determine whether he could return to work. Glass's final report indicated that Toronka should not return to work in his previous capacity, because he was not fit for duty in safety-sensitive areas, although Glass expressed optimism regarding Toronka's ability to find work in some other capacity at Continental. Glass recommended that Toronka take Alzheimer's medication. Tarbox recommended an antidepressant.

4

No. 10-20540

In February 2008, Continental advised Toronka he could no longer work as a material specialist because he was not fit for safety-sensitive tasks. Toronka met with his supervisors on three occasions to discuss other possible positions within Continental, but he did not express any interest or pursue any of their suggestions. He did not apply for any of the 584 job openings posted from January 2008 to June 2009.

In August 2008, David Schwartz, Toronka's physician, sent a brief letter to Continental's human resources department saying he had evaluated Toronka and believed he was physically and mentally fit to drive. Continental then arranged yet another independent evaluation with another psychiatrist, Michael Pipkin, who concluded Toronka should not return to work until a repeat neuro-psychological evaluation demonstrated improvement in his cognitive impairment.

Toronka then consulted a psychiatrist of his own, Ifeoma Arene, who said she saw no reason he could not return to work. So Continental obtained an independent evaluation from yet another neurologist, Carlos Porges, who concluded that Toronka suffered from marked cognitive defects and opined it was not safe for him to drive and did not think he could return to work.

## II.

We review a summary judgment *de novo*. *Floyd v. Amite Cnty. Sch. Dist.*, 581 F.3d 244, 247 (5th Cir. 2009). Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.* at 247-48. We review the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts in the nonmovant's favor. *Boston Old Colony Ins. Co. v. Tiner Assocs.*, 288 F.3d 222, 227 (5th Cir. 2002).

Title VII prohibits an employer from "fail[ing] or refus[ing] to hire or . . .

No. 10-20540

discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion . . . or national origin." 42 U.S.C. § 2000e-2(a)(1) (2006).  Without direct evidence of discrimination, a plaintiff can rely on circumstantial evidence.  *Rutherford v. Harris Cnty.*, 197 F.3d 173, 180 n.4 (5th Cir. 1999).  In that case, to prove a *prima facie* case of disparate treatment based on race, color, national origin, or religion, he must show (1) membership in a protected class, (2) that he was qualified for the position, (3) that he was subject to an adverse employment action, and (4) that he was treated less favorably than was a similarly situated employee outside the protected class.[2]

Whether two employees are similarly situated turns not on whether their situations are "similar" but on whether they are "nearly identical."  *Williams v.*

_____

[2] *See Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001); *Kretchmer v. Eveden, Inc.*, 374 F. App'x 493, 495 (5th Cir. 2010) (applying *Okoye* standard to claim of disparate treatment based on religion).  In addition, in the case of discrimination based on a protected status of which the employer would not obviously be aware, as is, for example, sometimes the case with religion or national origin, the employee must show that the employer was sufficiently aware of the employee's status to have been capable of discriminating based on it. *See, e.g., Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 81 (2d Cir. 2005) ("Without some evidence that an employer knew that it was replacing an older worker with a younger one, intentional discrimination cannot be the required conclusion. . . . [I]t is counter-intuitive to infer that the employer discriminated on the basis of a condition of which it was wholly ignorant.") (internal quotation marks and citation omitted); *Reed v. Great Lakes Cos.*, 330 F.3d 931, 934 (7th Cir. 2003) ("It is difficult to see how an employer can be charged with discrimination on the basis of an employee's religion when he doesn't know the employee's religion (or lack thereof[)] . . . ."); *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996) ("We cannot presume that an employer most likely practiced unlawful discrimination when it does not know that the plaintiff even belongs to the protected class. . . .  If the pregnancy is not apparent and the employee has not disclosed it to her employer, she must allege knowledge and present, as part of her prima facie case, evidence from which a rational jury could infer that the employer knew that she was pregnant."); *cf. Daniels v. City of Arlington*, 246 F.3d 500, 506 (5th Cir. 2001) (holding employee must show employer was informed of employee's religious belief to establish a *prima facie* case in a title VII reasonable-accommodations claim).  Because Toronka has not satisfied his *prima facie* case (for the reason that no other employees were similarly situated to him), we need not address Continental's awareness (or lack thereof) of Toronka's religion or national origin.

6

No. 10-20540

*Trader Publ'g Co.*, 218 F.3d 481, 484 (5th Cir. 2000). That employees' situations must be nearly identical means, *inter alia*, that the misconduct they engaged in must be nearly identical.[3] Assuming without deciding that Toronka satisfies the first three prongs, he must show that Continental treated another employee who was not of the same race, color, national origin, or religion more favorably than it treated Toronka in response to nearly identical misconduct.

Toronka names Elett Mercado, Chris Zirzle, Carlos Salazar, Angel Mendez, and Steve Alexa as similarly-situated employees who were treated more favorably. But there is no genuine issue of material fact as to whether any of them was responsible for an accident as serious as Toronka's: None of them caused an accident that sent someone to the hospital or caused similar property damage. Nor was any of them issued a police citation.

Mercado had driven her car into an unbarricaded ditch and injured no one but herself. Zirzle's accident involved no injuries to anyone, including himself, and no property damage to anything other than his vehicle. It is not evident whether Salazar and Mendez even got into accidents; Continental has no record of accidents involving either of them. But even if they did, the evidence shows only that they damaged the front of their vehicles, and there is no indication that they injured anyone. Finally, Alexa hit a wall with his vehicle, causing damage to his vehicle and the wall, but again there was no personal injury. All those accidents were a far cry from Toronka's crashing *through* a wall at high speed, injuring five people and sending three, including himself, to the hospital.

Indeed, Toronka's supervisor testified that Toronka's accident was the most serious in twenty years, and Toronka testified that he was not aware of any

---

[3] *See, e.g., Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001) ("We have held that in order for a plaintiff to show disparate treatment, she must demonstrate that *the misconduct for which she was discharged* was nearly identical to that engaged in by an employee not within her protected class whom the company retained.") (emphasis added) (brackets, internal quotation marks, and citations omitted)).

7

No. 10-20540

other coworkers' being involved in an accident similar to the one he caused. Therefore, even viewing the other accidents in the light most favorable to him, none is nearly identical in severity to what he did.  What the evidence shows is that Continental's failure to reinstate Toronka to his previous position after his accident was because of the seriousness of the accident, not his race, color, national origin, or religion.

### III.

Toronka also claims that he has been discriminated on the basis of disability under the ADA.  42 U.S.C. § 12112(a) (2006).  To prevail, he must prove that (1) he has a disability, (2) he is qualified, and (3) his employer made an adverse employment decision solely because of his disability.  *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1092 (5th Cir. 1996) (per curiam).  To be a "qualified individual," the employee must be "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  It would not be a reasonable accommodation to require the employer to eliminate essential job functions, modify job duties, reassign existing employees, or hire new employees, *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999), or, absent special circumstances, to undermine an established seniority system, *US Airways, Inc. v. Barnett*, 535 U.S. 391, 405-06 (2002).  An employer may be required to reassign a disabled employee to a vacant position, but only if that is reasonable.[4]

In his brief on appeal, Toronka concedes that he has an impairment that substantially limits his ability to drive and do other safety-sensitive work. Assuming *arguendo* that he is disabled, the next question is whether, viewing the

---

[4] *See* 42 U.S.C. § 12111(9) ("The term 'reasonable accommodation' *may* include . . . reassignment to a vacant position" (emphasis added)); *Daugherty v. City of El Paso*, 56 F.3d 695, 698-99 (5th Cir. 1995).

evidence in the light most favorable to him, he could perform the essential functions of a material specialist with reasonable accommodations or could reasonably be reassigned to a different, vacant job. The answer is no. The only way Toronka could avoid both driving and safety-sensitive duties as a material specialist is if he were permanently assigned to logbook and/or inventory duties to the exclusion of all the other tasks a material specialist does—Z-runner, outbound, inbound, puller, AOG, window, and utility.[5] But neither a permanent logbook position nor a permanent inventory position would be a reasonable accommodation.

Continental has no permanent logbook position. Our precedent is plain that an employer is not required to create a new job type to accommodate a disabled employee. *Burch*, 174 F.3d at 621. Toronka asserts that the absence of a permanent logbook position is immaterial, because some employees, on occasion, have been temporarily assigned to do exclusively logbook work to accommodate an injury. But that does not logically follow. That Continental, to avoid the costs of replacing an employee, occasionally has allowed employees to do nothing but logbook for a few months until they recovered from an injury does not mean that Continental should be forced to create a *permanent* logbook position, which —as distinguished from a temporary one—would mean that Continental would have to suffer permanent operating inefficiency. That is not reasonable: Because forcing Continental to create a permanent logbook position would eliminate essential duties of a material specialist and create a new job type, it is not a reasonable accommodation.

---

[5] The record describes the tasks as follows: (i) Z-runner (short for zoned runner), involves transporting parts from the warehouse to mechanics in different airport zones; (ii) outbound and inbound involve driving from the warehouse to aircraft and vice-versa to deliver parts; (iii) puller involves pulling parts with the forklift and order picker; (iv) AOG involves urgent delivery of parts to a grounded aircraft; (v) window involves identifying, pulling, and delivering parts on request; and (vi) utility involves assisting in all of the above functions. By contrast, logbook involves entering orders and weighing packages, and inventory involves taking stock of warehouse inventory. The evidence is not pellucid whether inventory also involves pulling parts.

No. 10-20540

With respect to inventory duties, it is true that Continental has permanent inventory positions for some employees, but they are available only for the first shift, and Toronka is not senior enough to get those jobs. Giving him one of them anyway would thus violate a *bona fide* seniority system, so, without anything more than a conclusional assertion on Toronka's part that his circumstances are special, Continental is not required to upend its seniority system just for his sake. *See US Airways*, 535 U.S. at 405-06.

Toronka alternatively contends that a lone inventory position can be created just for him in the second shift. But Continental has only one inventory supervisor, who works on the first shift. Toronka provides no evidence other than his *ipse dixit* to counter Continental's evidence (and common sense) that having a lone worker do inventory during the second shift would require either hiring an additional inventory supervisor to supervise the second shift or transferring more responsibility to existing second-shift supervisors. Therefore, there are no reasonable accommodations that would allow Toronka to take on a permanent-inventory position.

Toronka's last option is thus reassignment to another position at Continental. He argues that Continental violated the ADA because it did not engage in an "interactive process" with him in order reasonably to accommodate him in another position at Continental. An employer violates the ADA "when [its] unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee." *Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 736 (5th Cir. 1999). An employer is not, however, liable if the breakdown in the interactive process is traceable to the employee. *Id.* Toronka maintains that Continental referred him only to its jobs bank, but Continental has provided uncontroverted evidence that Toronka's supervisors met with him multiple times to discuss available positions for which Toronka met the minimum requirements based on his resume. Toronka did not apply for those jobs.

No. 10-20540

Toronka responds that he was not qualified for any of the available jobs and that Continental was required to provide a job for which he was qualified, but Toronka misunderstands the responsibility of an employer to provide a reasonable accommodation for a disabled employee. It is not an employer's responsibility to "fashion" a new job, as Toronka asserts. For reassignment to be a reasonable accommodation, a position "must first exist and be vacant."[6] Therefore, if Toronka was not qualified for any of the existing, vacant positions at Continental, then Continental did all it could, and Toronka has not shown that he can be reasonably accommodated by reassignment.[7]

The summary judgment is AFFIRMED.

---

[6] *Burch*, 174 F.3d at 620 (quoting *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997)).

[7] *See Foreman*, 117 F.3d at 810 ("[An employer is] not . . . obligated to accommodate [a disabled employee] by reassigning him to a new position. '[W]e do not read the ADA as requiring affirmative action in favor of individuals with disabilities, in the sense of requiring disabled persons be given priority in hiring or reassignment over those who are not disabled. It prohibits employment discrimination against qualified individuals with disabilities, no more and no less." (quoting *Daugherty*, 56 F.3d at 700)).