# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 19, 2011

Lyle W. Cayce
Clerk

No. 10-60650

THE ESTATE OF MABLE DEAN BRADLEY, by and through Gloria Sample, Administratrix of the Estate of Mable Dean Bradley, as Assignee of claims held by Grancare, Incorporated, Mariner Health Care, Incorporated, Boyd P. Gentry, George Morgan, M. Scott Athans, Robin C. Skelton and Eleta Jo Grimmett,

Plaintiff–Appellant

v.

ROYAL SURPLUS LINES INSURANCE COMPANY, INCORPORATED; LUMBERMEN'S MUTUAL CASUALTY COMPANY,

Defendants–Appellees

Appeal from the United States District Court
for the Northern District of Mississippi

Before REAVLEY, GARZA, and SOUTHWICK, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

In this insurance coverage dispute, the Estate of Mable Dean Bradley ("the Estate") appeals the district court's grant of summary judgment to the Defendants–Appellees Royal Surplus Lines Insurance Co. ("Royal") and Lumbermens Mutual Casualty Co. ("Lumbermens").[1] The district court found that, as a matter of law, Royal and Lumbermens were not required to defend or

---

[1] The Estate erroneously identified Lumbermens as "Lumbermen's" in the complaint and in the proceedings below. The district court accepted this nomenclature, but we will refer to Lumbermens by its proper corporate name.

No. 10-60650

indemnify a policyholder/defendant in a separate lawsuit brought by the Estate in a Mississippi state court. For the reasons that follow, we AFFIRM.

## I

Mable Dean Bradley was a resident at the Indianola Health and Rehabilitation Center from February 7, 2000, to May 17, 2002, when she was transferred to the South Sunflower County Hospital in Sunflower County, Mississippi. Bradley died within 24 hours of her admission to the hospital. The immediate causes of death included acute dehydration and an untreated urinary tract infection.

Bradley's estate brought suit in Mississippi state court against the Indianola Health and Rehabilitation Center's corporate parent, Mariner Health Care, Inc., and several other defendants ("the Mariner defendants"). The Estate sought recovery based on claims of negligence, mistreatment, malice and/or gross negligence, fraud, breach of fiduciary duty, statutory survival, and wrongful death arising out of Bradley's residency at the Indianola nursing home. The Estate's complaint further alleged that the wrongs Bradley suffered "were of a continuing nature, and occurred throughout Mable Dean Bradley's stay at the Defendant's facility."

After a ten-day jury trial in the Circuit Court of Sunflower County, the jury awarded $1.5 million in compensatory damages and $10.5 million in punitive damages to Bradley's estate, and the trial court entered final judgment accordingly. No appeal was taken from the trial court's order. The Mariner defendants wanted to pursue an appeal, and Mariner's first layer excess insurer, Lexington Insurance Company ("Lexington"), agreed to post a portion of the appellate bond. Mariner's second and third layer excess insurers—Royal and Lumbermens, respectively—would not, however. Royal maintained that the applicable portion of its excess policy had not been triggered at that point, and thus, it owed no duty to participate in bonding the jury's award on appeal.

No. 10-60650

Lumbermens insisted that its excess policy was limited to indemnification, and therefore, it owed no duty to participate in defending the Mariner action or in posting an appellate bond.

The Mariner defendants and Lexington then entered into a settlement agreement with the Estate that extinguished "any and all claims relating to" Bradley's care and treatment at the Indianola nursing home, "including claims for damages, costs, or attorney's fees . . . in exchange for $10.5 million." Together, Lexington and Mariner paid a total of $2.3 million to the Estate as part of the settlement; Royal and Lumbermens paid nothing. Mariner assigned its interest in any claims against Royal and Lumbermens to the Bradley estate.

In February 2008, the Estate filed suit against Royal and Lumbermens in federal district court, based on the parties' diversity of citizenship, seeking recovery for Royal's and Lumbermens' alleged bad faith failure to defend or indemnify Mariner in the underlying state lawsuit and settlement. The Estate moved for summary judgment, asking the district court to find that the Royal policy in effect from March 1999 to March 2000, and the Lumbermens policy in effect from March 1998 to March 2001, provided excess coverage to Lexington's first layer excess policy in effect from July 1999 to July 2000.[2] The Estate also asked the court to find that the policies described above required the excess insurers collectively to defend and indemnify Mariner for the final judgment in the underlying state suit. Royal and Lumbermens filed cross-motions for summary judgment, asking the court to find to the contrary.

In December 2010, the district court denied the Estate's motion and granted summary judgment for both insurers, finding as a matter of law that

---

[2] Royal issued two second layer excess policies that were in effect at different times during Bradley's February 2000 to May 2002 stay at the Indianola nursing home. There were three Lexington policies in effect at different times during this same 27-month span. The Estate's decision to seek summary judgment under the specific policies described above is discussed in Section III.A.2, *infra.*

No. 10-60650

Royal's and Lumbermens' respective policies did not require them to defend or indemnify Mariner in the state lawsuit.  Because Royal and Lumbermens were not obligated to provide coverage in the underlying suit, the Estate's bad faith action could not lie, and the district court dismissed the Estate's claim with prejudice.  This appeal followed.

## II

We review a district court's grant of summary judgment *de novo*, applying the same standards as the district court.  *See Floyd v. Amite Cnty. Sch. Dist.*, 581 F.3d 244, 247 (5th Cir. 2009).  We view all facts in the light most favorable to the nonmoving party, and affirm only if the evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Floyd*, 581 F.3d at 247–48.

Where federal jurisdiction is based on diversity of citizenship, as it is here, we apply the substantive law of the forum state.  *See Erie R.R.  v. Tompkins*, 304 U.S. 64, 78 (1938).  To determine Mississippi law, we look to the final decisions of Mississippi's highest court.  *See Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003).  Because the Mississippi Supreme Court has not addressed the issues presented here, the district court had to make an "*Erie* guess" as to how that court would have resolved the issues if presented with them.  *Id.; see also Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191–92 (5th Cir. 2010); *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 749–50 (5th Cir. 1995).  We do the same, *de novo*, on appeal.

## III

The Estate argues that the district court erred in finding that Royal and Lumbermens were not required to insure Mariner in the underlying state action.  Specifically, the Estate contends that Royal's excess policy unambiguously required Royal to defend and indemnify Mariner for the state court judgment

No. 10-60650

and resulting settlement, and that the Lumbermens policy required it to indemnify Mariner for the same.[3]

## A

Under Mississippi law, an insurer's duties to defend and indemnify its insured are distinct and separate duties requiring the use of different standards. *See Titan Indem. Co. v. Pope*, 876 So. 2d 1096, 1101–02 (Miss. Ct. App. 2004); *see generally* 14 Lee R. Russ & Thomas F. Segala, COUCH ON INSURANCE § 200:3 (3d ed. 2007); 3 Jeffrey E. Thomas et al., NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION §§ 16.06[3][a], 17.01[1][b][ii] (2010). When an insured is sued, an insurer's duty to defend is determined solely by comparing the facts alleged in the complaint with the terms of the policy. *See United States Fid. & Guar. Co. v. OmniBank*, 812 So. 2d 196, 200 (Miss. 2002); *Delta Pride Catfish, Inc. v. Home Ins. Co.*, 697 So. 2d 400, 403 (Miss. 1997). An insurer "has an absolute duty to defend a complaint which contains allegations covered by the language of the policy, but . . . no duty to defend those claims which fall outside the coverage of the policy." *Farmland Mut. Ins. Co. v. Scruggs*, 886 So. 2d 714, 719 (Miss. 2004). Because whether Royal had a duty to defend Mariner in the underlying state suit rests on the factual allegations in the complaint and the language of its policy, we address this issue as a matter of law. *See Noxubee Cnty. Sch. Dist. v. United Nat'l Ins. Co.*, 883 So. 2d 1159, 1165 (Miss. 2004) ("The interpretation of an insurance policy is a question of law, not one of fact.").

### 1

Here, the district court looked to the terms of the Royal excess policy and observed that Royal's duty to defend arose only after the actual payment of

---

[3] The Estate's motion for summary judgment argued that Lumbermens owed a duty to indemnify *and* defend the Mariner defendants, and the district court's opinion addressed both arguments accordingly. On appeal, the Estate's opening brief only presses the first argument; the second is waived. *See Valle v. City of Houston*, 613 F.3d 536, 544 n.5 (5th Cir. 2010).

No. 10-60650

judgments or settlements had exhausted any underlying insurance, and because that condition precedent was never satisfied, Royal's defense obligation never matured. We agree.

The Royal second layer excess policy at issue—the Big Shield Commercial Catastrophe Liability Policy—was a general liability policy that provided $10 million in coverage excess of Lexington's $2 million first layer excess policy, which itself followed Mariner's $1 million self-insured retention. With respect to Royal's duty to defend, the Big Shield policy provided:

> 1. INSURING AGREEMENT
>
> > 1. . . .
> >
> > 2. We will have the right and duty to defend any "suit" seeking those damages [that the insured becomes legally obligated to pay] when:
> >
> > > (a) The applicable limits of insurance of the "underlying insurance" and other insurance have been used up in the payment of judgments or settlements . . . .

The parties agree that Lexington's $2 million first layer excess policy and Mariner's $1 million self-insured retention make up the "underlying insurance" referred to in this section of the Royal policy.

Royal's Big Shield policy also included an endorsement that modified the policy's default terms and limited coverage for professional liability:

> PROFESSIONAL LIABILITY LIMITATION
>
> This endorsement modifies insurance provided under the following:
>
> > Commercial Catastrophe Liability Insurance ("Big Shield" Policy)
>
> With respect to "Professional liability" arising out of any Insured's activities as a(n) Nursing Facilit[y] this policy is limited to the coverage provided in the "Underlying Insurance".

No. 10-60650

> If coverage is not provided by "Underlying Insurance", coverage is excluded from this policy. . . .

Lexington's first layer excess policy is the "underlying insurance" contemplated here.

The gravamen of the Estate's claim is that Royal's policy "followed form" to the Lexington policy in all respects, and because Lexington had a broad duty to defend under its own policy and was obligated to pay all premiums on appeal bonds, that Royal likewise was obligated to defend and participate in bonding the jury's award on appeal.[4] This is mistaken.

As the district court correctly observed, nothing in the Royal policy suggests that it follows form as to *all* terms and conditions in the Lexington policy. Rather, the Professional Liability Limitation endorsement is the only term that contains a follow form provision, and it specifies that the Royal policy will follow form to the Lexington policy "*[w]ith respect to 'professional liability'*" arising out of Mariner's operations at the Indianola nursing home. A review of the Lexington policy's corresponding Medical Professional Liability Coverage endorsement reveals no reference to a defense obligation. Thus, in the absence of a duty to defend under the Lexington policy's relevant endorsement, Royal's defense obligation, if any, must be determined by reference to the default terms of the Big Shield policy. And, as that policy provided, Royal's duty to defend only arose after "[t]he applicable limits of the 'underlying insurance' and other insurance have been used up *in the payment of* judgments or settlements . . . ."

---

[4] *See Insituform Techs., Inc. v. Am. Home Assur. Co.*, 566 F.3d 274, 278 (1st Cir. 2009) ("The phrase 'follow form' refers to the practice, common in excess policies, of having the second-layer coverage follow substantively the primary layer provided by the main insurer."); *see also id.* at 278 n.3 ("[B]ut is a mistake to assume precision in such terminology; and even where a policy is described as 'follow form,' it does not necessarily provide coverage that is substantively *identical* to the underlying one.") (emphasis in original) (citing Barry R. Ostrager & Thomas R. Newman, 2 HANDBOOK ON INSURANCE COVERAGE DISPUTES § 13.01 (11th ed. 2002)).

No. 10-60650

(emphasis added). Contrary to the Estate's claim, the mere entry of a judgment that exceeded the limits of the underlying insurance was insufficient to trigger Royal's defense duty. Instead, Royal's policy required *actual payment* that exhausted Mariner's self-insured retention and Lexington's policy limits. That condition never occurred prior to Mariner's settlement with the Bradley estate. As such, Royal did not have a duty to post an appellate bond or otherwise defend its insured in the underlying state lawsuit.

**2**

Unlike the duty to defend, which can be determined at the beginning of a lawsuit, an insurer's duty to indemnify generally cannot be ascertained until the completion of litigation, when liability is established, if at all. *See Barden Miss. Gaming LLC v. Great N. Ins. Co.*, 576 F.3d 235, 239–40 (5th Cir. 2009); *see also VRV Dev. L.P. v. Mid-Continent Cas. Co.*, 630 F.3d 451, 459 (5th Cir. 2011) ("[A]n insurer's duty to indemnify typically can be resolved only after the conclusion of the underlying action.") (applying Texas law). This is because, unlike the duty to defend, which turns on the pleadings and the policy, the duty to indemnify turns on the actual facts giving rise to liability in the underlying suit, and whether any damages caused by the insured and later proven at trial are covered by the policy. *See Columbia Cas. Co. v. Ga. & Fla. Railnet Inc.*, 542 F.3d 106, 111 (5th Cir. 2008) (applying Texas law); *see generally* 14 COUCH ON INSURANCE § 200:3; 3 NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 17.01[1][b][ii]. Thus, in determining whether Royal or Lumbermens had any duty to indemnify Mariner, we look to the actual facts put forward at trial that established Mariner's liability in the state lawsuit.[5]

---

[5] We note that the Mississippi case law addressing liability insurers' separate duties to defend and indemnify is limited, and that the duty to defend is discussed almost exclusively in those Mississippi cases identifying the two duties. The lone exception appears to be *Titan Indemnity Co. v. Pope*, 876 So. 2d 1096 (Miss. Ct. App. 2004). In making an *Erie* guess as to Royal's and Lumbermens' indemnification obligations here, we rely on Circuit precedent and

8

No. 10-60650

At the outset, we note that there were two Royal policies in effect, and three Lexington policies in effect, at different times during Bradley's February 2000 to May 2002 stay at the Indianola nursing home.[6] The Estate sought summary judgment based on the Royal policy in effect from March 1999 to March 2000, and the Lumbermens policy in effect from March 1998 to March 2001. Obviously, a significant portion of Bradley's 27-month residency fell outside the coverage periods for these specific policies. The Estate argued below, as it does here, that Bradley's injuries "were of a continuing nature" and that under the terms of the Lexington policy's professional liability endorsement, the entire 27-month span of Bradley's stay was to be considered a single "medical incident." The Estate elected, its argument goes, to submit its claim under that combination of policies that offered the greatest coverage limits at any single point during Bradley's residency.[7]

Unsurprisingly, Royal and Lumbermens take issue with the claim that Bradley's injuries should be characterized as one continuous "medical incident." Both excess insurers note that the injuries that immediately preceded Bradley's death—acute dehydration, a broken femur, and an untreated urinary tract infection—occurred in April and May 2002, well outside either of Royal's or Lumbermens' policy periods. And, the insurers argue, the jury's compensatory

---

leading secondary sources accordingly. We have found nothing in our research that suggests that the Mississippi Supreme Court would deviate from the accepted definition of indemnity if that court were called upon to decide the question before us.

[6] There is only one Lumbermens policy at issue in this case.

[7] The Texas Supreme Court authorized this type of election in cases where a single, indivisible injury triggers more than one policy, covering different policy periods. *See Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 855 (Tex. 1994). The Mississippi Supreme Court has not passed on the issue decided in *Garcia* and we do not reach it either.

9

No. 10-60650

and punitive damages awards were based on these three injuries specifically; not a finding of continuing negligence.

The Lexington medical professional liability endorsement is indeed the correct benchmark for assessing Royal's duty to indemnify Mariner. This is because, as all parties agree, Royal's excess policy follows form to the Lexington policy with respect to professional liability. The Lexington policy provides:

> I. COVERAGE – MEDICAL PROFESSIONAL LIABILITY
>
> 1. The Company [Lexington] will pay on behalf of the **Insured** [Mariner] that portion of **ultimate net loss** in excess of the Self-Insured Retention which the **Insured** shall become legally obligated to pay as **Damages** which occur during the policy period, resulting from a **medical incident** arising out of the following professional services provided by the **Insured** to any person at any pharmacy or facility owned, managed or operated by the Named Insured in Item # 1 of the Declarations:
>
>    a) medical, surgical, dental or nursing treatment to a **patient**, including the furnishing of food or beverage in connection therewith;
>
>    b) furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances if the **personal injury** occurs after the **Insured** has relinquished possession thereof to others;
>
>    . . .
>
>    Any such rendering of or failure to render the above described professional services, together with all related acts or omissions in the furnishing of such services to any one **patient** resulting in a **claim** shall be considered as arising out of one **medical incident**.

(emphasis in original). The Estate relies on this provision, coupled with its assertion that it put on evidence at trial demonstrating Mariner's negligence throughout Bradley's 27-month stay, for the proposition that the jury's verdict

10

included the specific Royal and Lumbermens policy periods in issue. The record suggests otherwise.

The state trial record shows that the claims submitted to the jury related exclusively to the injuries that Bradley suffered in the weeks before her death (i.e., dehydration, a broken femur, and a severe urinary tract infection).[8] The trial court restricted expert testimony to the April–May 2002 time frame, and the Estate's medical expert on causation, as well as Bradley's attending nurse practitioner, limited their testimony to this time frame accordingly. While the Estate did present some evidence of Mariner's general negligence that occurred throughout the term of Bradley's stay, in the form of insufficient staffing and charting irregularities, this evidence could not have supported the jury's liability findings or damages awards. This is because the trial court charged the jury with finding that for medical liability to attach, there had to be a causal relationship between Mariner's wrongful conduct and Bradley's injuries. And the only evidence providing a nexus between Mariner's wrongful conduct and actual harm to Bradley related to conduct that occurred in April and May 2002.

Lexington's first layer excess policy unambiguously limits indemnity to those damages resulting from medical incidents "which occur during the policy period." And because the Royal and Lumbermens policies follow form to the Lexington policy with respect to medical professional liability, Royal and Lumbermens only had a duty to indemnify Mariner for those damages that occurred within their respective policy periods. Here, those policy periods ran from March 1999 to March 2000, and March 1998 to March 2001, for Royal and

---

[8] The Estate argues that it was error for the district court to refer to the state trial record, and it contends that we are likewise precluded from doing so on appeal. There is no support for this assertion. *See N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.*, 541 F.3d 552, 558 n.12 (5th Cir. 2008) (applying Texas law). The state trial record was properly before the district court and, in determining the facts underlying the Estate's indemnity claim, the court was free to look to the record from the underlying suit. *See* FED. R. CIV. P. 56(c).

Lumbermens, respectively. Because the actual facts giving rise to liability in the underlying suit occurred outside of Royal's and Lumbermens' policies, neither excess insurer had a duty to indemnify Mariner for the judgment or settlement in the underlying state suit. There being no duty to indemnify, there could no breach in denying coverage. *See A & S Trucking Co. v. First General Ins. Co.*, 578 So. 2d 1212, 1218 (Miss. 1991). The Estate's bad faith action fails as a matter of law.

## IV

The district court's summary judgment is AFFIRMED.